Upon the trial the negro in question was proved to be *Page 408 
the property of Nancy Davis, as charged in the indictment; and it was also proved, that he was stolen, or seduced or went from her plantation in Rutherford, on the fourth Saturday of July, 1836.
One Robins was then produced as a witness for the state. He testified that on Sunday, the next day after the disappearance of the slave, he saw, at a meeting-house in the neighbourhood, Haney, one of the accused, with whom, as well as with the prisoner, he, the witness, had been acquainted about a year. Haney informed him, that a negro had come to him the preceding night a little before day; and then requested witness to go that evening to the prisoner, Hardin, and tell Hardin to meet him at a place called Webb's old field that night, about an hour after dark; and also that he, the witness, should accompany Hardin. In the course of the conversation, Haney remarked, "Hardin has missed the one he has been trying to secure; but good luck will come after bad. Tell him, this boy has come to me." The witness made the communication to the prisoner, Hardin; and they went together to the place and at the time appointed, and there found Haney. Upon a whistle by Haney, a large negro-man came up to them; and, in reply to Hardin's question, where did he come from? Haney said, "he came from the widow Davis." Haney then remarked, "You, Robins, must take him off. It will be a safe trip, as the widow has not energy to press like some people. In the mean time Hardin will keep him till you get ready to start." That was then agreed on by the three; and Haney left them — remarking to Hardin, "You know our agreement;" to which Hardin replied, "yes," and added, "it will do." The prisoner, the witness and the negro then went together within half a mile of Hardin's house; when Hardin suggested that there might be some person at his house, and proposed that the negro and the witness should stay in the woods until he should go to see, and return to them. Hardin did not return that night, but came the next morning with food for them. It was then agreed between Hardin, Robins and the negro, that Robins should take the negro to South Carolina and there sell him; that he *Page 409 
should go that day, and make his preparations; and that the negro should meet him the next day at a point designated on the road. The witness accordingly proceeded, and on the next day the negro met him according to appointment; and Robins and another associate, named Williams, carried him to South Carolina and sold him for nine hundred dollars; of which part was paid to Williams; and upon the return of Robins to this state, the sum of one hundred and forty-five dollars was paid to Haney, and two hundred and fifty-five dollars to the prisoner, Hardin. Upon his cross-examination, the witness stated that his habits had been moral and upright until he had become acquainted with the three persons charged in this indictment, who influenced him to join an association which they called a club, and represented to have members spread over the country; and that this was his first adventure in the way of selling slaves. But when further pressed, he admitted that he had before sold a free negro, named Wingfield for one thousand dollars, of which he gave two hundred dollars to Wingfield himself for agreeing to be sold; two hundred dollars to a man in South Carolina, for helping him to sell the free negro; one hundred dollars to Haney, and ninety dollars to the prisoner, Hardin; and that he spent the residue himself. He also stated, that when he paid to Haney his share of the price got for Mrs. Davis's negro, Haney said to him and Hardin, "You know our plan is to steal the negro again and sell him over, so you must make up something to pay for doing that:" upon which each of them gave Haney twenty-five dollars more. In the division of the money, Hardin insisted upon having the largest share, in consequence of "his having tried so long to get a negro, in which he met with bad luck."
The witness, in the course of his examination, stated a great number of minute incidents as occurring on his journey; as to which his testimony was sustained, and in some points contradicted, by that of others. But he was not corroborated directly in any part of his testimony relative to the transactions with Hardin in particular.
The counsel for the prisoner, moved the Court to instruct *Page 410 
the jury, that they ought entirely to disregard the testimony given by Robins, the accomplice, because it was not supported, in any material part, by which a personal agency of Hardin was shown. The counsel further moved the Court to instruct the jury, that if they should believe the said evidence of Robins, yet they ought not to find the prisoner guilty; because upon that evidence the prisoner was not a principal in the felony committed, but only an accessory.
His Honor Judge PEARSON refused to give either instruction as prayed. Upon the first point he charged the jury, "that if the narrative of the accomplice, Robins, from the manner in which it was told, and the matter stated, and from the confirmation it received in many material parts by other testimony, carried to their minds a full and entire conviction of its truth, they might convict the prisoner, although the narrative was not confirmed in any material part, in which Hardin had a personal agency; that it was more satisfactory, when the evidence of an accomplice was supported in the latter particular; but it was not indispensable, provided the jury, from the other particulars, were satisfied the witness was entitled in fact to full credit."
Upon the other point, his Honor charged the jury, "that if they were satisfied from the evidence, that the prisoner, the witness, and Haney, had entered into an agreement to steal or seduce away negroes from their owners, and have them run off to South Carolina or elsewhere, and sold for the benefit of those concerned; and that in pursuance of such agreement, Haney had procured the negro Eli, mentioned in the indictment, to leave his owner, Nancy Davis, and come to him, and afterwards to meet the prisoner Hardin, the witness Robins, and Haney, in Webb's old field; and that the slave was there delivered by Haney to Hardin, and received by Hardin with a full knowledge on the part of Hardin, that he was the property of Nancy Davis, and had been stolen or seduced from her; and that Hardin kept the negro for a day, and then procured him to meet Robins and Williams on the road; and that they ran him off to South Carolina, and there sold him in *Page 411 
pursuance of the said agreement, and divided the money, as deposed to by the witness, Robins; then the jury were authorized to find the prisoner guilty under the indictment."
The jury found the prisoner guilty; and he moved for a new trial for error alleged in the foregoing instructions; which was refused, and sentence of death passed; from which the prisoner appealed.
The evidence given on the trial, was not stated in the exceptions of the prisoner, or in the case made out by the judge. It was stated in the transcript, that it was deemed unnecessary to set forth the evidence in detail, as it was much the same as in the case of the State v. Haney, which had gone to the Supreme Court from Rutherford, upon the same indictment. The attorney-general, however, did not think it proper to insist upon the omission, supposing it to be mere oversight; and consented to amend the record in this case, by inserting in it the evidence which appeared, by the record in the other case, to have been given on that trial.
— The first ground of exception in this case, has been so recently and fully considered in the State v. Haney, that nothing remains to be added on it. The evidence of an accomplice is undoubtedly competent, and may be acted on by the jury, as a warrant to convict, although entirely unsupported. It is, however, dangerous to act exclusively on such evidence, and therefore the Court may properly caution the jury, and point out the grounds for requiring evidence confirmatory of some substantial part of it. But the Court can do nothing more; and if the jury really yield faith to it, it is not only legal, but obligatory on their consciences, to found their verdict upon it. And in Rex v. Dawlar and others, the jury were advised, that they ought to do so against all the prisoners, when, upon an indictment against several, the evidence of the accomplice was confirmed as to some of them, but not as to all. 3 Stark. 34, and note. *Page 412 
It ought to be premised, before considering the other exception, that the Court would have been under much difficulty in getting at it, had not the amendment been made in the record. It is not competent to reverse a judgment, for an abstract opinion delivered by the judge, however erroneous; and unless the evidence be so stated as to raise the question decided, it is merely abstract. Nor can the Court here go out of one record to another to find the evidence given, or the points made or decided in the former. The record in each case must be complete in itself, without invoking that in any other case. The humanity of the Attorney-General has, indeed, properly removed the objection in this case; and it is hoped that there will be no occasion for him to be thus indulgent to a prisoner again.
Upon this objection of the prisoner, as applied to the evidence, and the instruction given on it, the Court is of opinion, that the judgment is erroneous, and that there must be a venire de novo.
The prisoner is found guilty generally, upon both counts in the indictment: yet it will serve the purpose of distinctness, to consider each separately.
The first is for a larceny of the slave; as to which, it has been held to be a felony at the common law, and that the statute only ousts it of clergy. The evidence, we are satisfied, established a conspiracy between the accused persons and the witness, to steal or seduce negroes; and that those persons, or any of them, should carry them to a distance from their owners, and sell them for the common benefit. But the concerting of such a plan does not make all the parties to it guilty as principals, upon a subsequent stealing of a slave by any one of them. There must also be a concurrence and participation in the acts of taking and carrying away. This is ordinarily evinced by those acts being done by the prisoner himself, or by some other, when he is present, or so near that he can assist in the fact, or in the escape of him who actually perpetrates it. Presence, therefore, in its legal sense, generally distinguishes the guilt of a principal from that of an accessory. If the taking and carrying away be completed in the *Page 413 
absence of one of the conspirators, his previous assent to or procurement of those acts, do not make them his acts; nor does his subsequent adoption of them, by receiving the thing stolen, or aiding in concealing or disposing of it, according to the original design, have that effect. The reason is, that the taking and carrying away constitutes the offence, thecorpus delicti; and in that he had neither actually nor potentially, a personal agency. The least removal is an asportation, and completes the crime of him who effects it. 4 Bla. Com. 231. Lapier's Case, 1 Leach, 360. It is true, the removal must be such, as to amount to exclusive possession in the thief; and therefore, if goods are fastened to a counter by a string, or a purse to the person, or it becomes entangled with keys in the owner's pocket, so that the possession was not actually at any time changed, the taking those things with the view of stealing them, is not a larceny, for the want of a severance and asportation. 1 Hale, P. C. 508.Cherry's Case, 2 East's P. C. 556. But if the possession be once taken by the thief, although but for an instant, the crime is committed; because thereby the possession and dominion of the owner is, at least for that instant, destroyed. Thus, if one intend to steal plate, and he take it out of a chest, and lay it on the floor, but is detected before he gets away, it is a sufficient asportation. Kel. 31. According to these principles, the larceny in this case, was committed by Haney alone. When the witness and the prisoner, Hardin, first saw the negro, he was in the possession of Haney. According to the testimony of the owner, the negro disappeared on Saturday night; and according to the information given by Haney to Robins, he was in the possession, and under the exclusive control of Haney, from that time, until Sunday night. There is no evidence to connect the prisoner with the possession at any time before the meeting in Webb's old field. It is true, it does not appear how near that was to Mrs. Davis's. But it cannot be taken upon this record, that it was so near, as to make that the
original, or an original taking from the owner; for the instruction supposes that Haney had procured the negro to come to him, and that heafterwards delivered him to *Page 414 
Hardin, with a knowledge on the part of Hardin, that he had been stolen or seduced. The instruction must therefore have been founded on the preconcert; and on the idea that the part which Hardin played was in fulfilment of the previous plan; so as to make the whole one continuing transaction. In support of that view, it has been contended, on behalf of the state, that the original plan embraced every thing that was done, including the asportation by Hardin, as a single transaction, and therefore, that it is to be so regarded now. The cases relied on to support these positions, are those of Dyer and Disting, and Atwell and O'Donnell, 2 East, P. C. 557, and 767-8. In those cases, goods were removed from one part of a barge, and one part of a warehouse to another part, with the view of concealing them, and making it more convenient to remove them entirely, when it could be done with more apparent safety; and persons, who did not concur in those acts, but assisted in the final removal from the boat and warehouse, were held to be guilty, as accomplices in the felony, notwithstanding the offence was complete upon the first removal, as to those who made it. No other cases have made the distinction between a receiver and an accomplice, so nice. But the principle established by them is probably sound. Yet it does not reach the case before us. Those cases proceed distinctly on the ground, that while the goods remained in the barge or warehouse, they were properly in the place where the owner had deposited them, and were therefore virtually in his custody; and he could not be said by those, who assisted in the act of finally carrying them away, to have lost his dominion over them, until they were taken from that place of deposit. But that does not apply in a case where a possession is gained by the first removal, clearly in exclusion of that of the owner. InKing's Case, Easter Term, 1817, Russ. Ry. Cr. Cas. 332, some persons stole a parcel of butter out of a warehouse, and carried it along the street, thirty yards only, and then brought the prisoner to the place, and informed him of what they had done, and he assisted in carrying the property to a cart, which was kept in waiting at some distance, to convey it away. At first, it *Page 415 
was thought the prisoner was guilty, upon the ground, that he was present, aiding and abetting in the continuation of the larceny, by carrying the goods to the cart; and he was found guilty. But the case being reserved for the opinion of the twelve judges, they held the conviction wrong, becausethe taking was complete, before the prisoner had any part in the transaction. In that case, it does not appear, that there was any previous conspiracy; though from the immediate concurrence of the prisoner, when carried to the spot, one might be readily inferred, if not to steal that particular property, yet to unite in thefts generally, as in the case before us. But in Kelly's Case, in 1820, Russ. Ry. Cro. Cas. 421, that feature was supplied. The prisoner was tried and convicted before Mr. Justice BAYLEY, for stealing two horses. It appeared in evidence, that one Whinroe and the prisoner went to steal the horses. But the prisoner stopped when they got within half a mile of the place where the horses were, and Whinroe went on, stole the horses, and brought them to the place where the prisoner was waiting for him, and then they both rode them away together. The learned judge thought Kelly guilty, as well as Whinroe; but upon adverting to King's Case, he thought his first opinion wrong, and reserved the case. All the judges held the conviction wrong; being of opinion, that the prisoner was an accessory only, and not a principal, because he was not present at the original taking. If going towards the place where a larceny is to be committed, in order, according to a previous agreement, to assist in conveying away the property, and actually assisting accordingly, will not make the person a principal, if he was at such a distance at the time of the taking, as not to be able to assist in it; it follows a fortiori, that merely receiving the stolen goods, twelve hours after they were taken, without any previous knowledge that they had been taken, or even that they in particular were to be taken, can only render the person an accessory to the larceny. It is erroneous to suppose, because in the conspiracy the ultimate disposition of the property, and its being carried towards that end first by the hand of one of the conspirators, and then of another *Page 416 
was contemplated, that the whole is one continuing transaction. Those were to be events consequent upon the larceny. They do not enter into the larceny, as parts of the corpus delicti; but that crime was complete by the original caption and asportation from the possession of the owner. The common unlawful design to steal, does not make each of the parties a principal, unless, as Judge FOSTER says, p. 350, at the commission of the crime "each man operates in his station at one and the same instant, towards the same common design;" as where one is to commit the fact, and others to watch at proper distances, to prevent surprise, or to favour escape, or the like.
The foregoing observations enable us in a good degree, we think, to arrive at a proper conclusion, upon the second count of the indictment, which is for seducing and conveying away the slave. This is a new offence, and depends entirely upon the statute. The Court is not, indeed, free from doubt, whether the known circumstances under which the crime of seducing slaves is ordinarily perpetrated, requiring the cooperation of many in taking, concealing, or harbouring and transporting them, do not require upon the words "take or convey," in the statute, an interpretation, thateither constitutes the offence, within the meaning of the legislature. If that were correct, then the conveying by one, although another had stolen the slave, would itself be a principal felony. This doubt has not been slightly strengthened by the application in the same section of the act, of the same term "convey," to free negroes; it being made a capital felony, to "take or convey a free negro out of this state into another, with intention, c." But upon deliberate consideration, we have felt ourselves bound, in a case so highly penal, to construe the statute, in reference to slaves, to mean a taking and carrying from the possession of the owner; or, in other words, that convey is used merely as expressive of asportation in other cases. The indictment before us is framed on that notion; charging that the negro was in the possession of the owner; and that the prisoner "did take and convey him away from the possession of her, the said, c."
That we deem the proper sense of the act. *Page 417 
The preamble is indicative of it. It recites the pernicious practices of stealing, or otherwise "carrying away" slaves, as also of stealing "andcarrying off" free negroes; which shows, that convey is substituted, in the body of the act, for carry away, and is used in the same sense. Besides, "conveying" implies two termini; the one from which the person is conveyed, and the other, to which he is conveyed. With respect to free negroes, the former is necessarily this state, and any part of it; because the subject is alike free everywhere, and the offence is conveying him out of thisstate; and of course the latter terminus is any other state. But with respect to slaves, the asportation need not be out of this state; but may be altogether in it. Unless, therefore, the point at which it is to begin be when the slave was in the owner's possession, the act gives no other terminus. The distinction is the clearer, as the preamble applies the wordaway to slaves, and off, to free negroes. The point has never been brought directly to the notice of the Court heretofore; but cases have arisen, in which it would have been decisive, and saved much discussion, if it had been deemed tenable. For instance, there could have been no difficulty inDavis's Case, 2 Car. Law Repos. 291, if every conveying a slave with intent to sell, be within the act, and it would have been immaterial whether a runaway slave was the subject of larceny, or not. In Jernagan's Case, N.C. Term Rep. 44, Chief Justice TAYLOR was of opinion, that the act did not even embrace a person who was present at the original taking, aiding and abetting in it, because his was not the hand which committed the fact. The other members of the Court did not indeed concur in that part of the opinion; but there was no impression entertained, that a subsequent distinct asportation, after the owner's possession was lost, made the person a principal felon, upon the force of those words, "or convey." We think, if such had been the purpose of the legislature, it would have been explicitly expressed, in terms more appropriate, and less equivocal. If others besides those who seduce slaves, and convey them from the possession of the owners, or participated in those acts, had been meant, the act would have expressly *Page 418 
mentioned procurers and receivers, or used some terms which explicitly embrace them; as has been done in analogous cases. The statute against the forcible abduction of women, 3 Hen. 7, c. 2, furnishes an example. After reciting the evil of women being "taken by misdoers, contrary to their will, and married, or defiled," it enacts, that "such taking, procuring, or abetting the same, and also receiving wittingly such women, be felony; and that such misdoers, takers, and procurators to the same, and receitors, be adjudged principal felons." So the statute of 4 5 Phil. and Mary, against alluring away female children from their parents, uses this very word "convey," but in a way which leaves no doubt of its proper signification. It recites the dangerous practices by lewd persons, and others, that for reward buy and sell female children, secretly allured to contract matrimony with unthrifty persons, of taking by sleight or force and conveying away female children from their parents; and enacts, "that it shall not be lawful to any person or persons, to take or convey away, or cause to betaken or conveyed away, any maid, c., out or from the possession, custody, or government of the father of," c. And the language in a very modern British statute upon this subject, that of 9 G. 4, c. 31, is equally explicit. The 19th section enacts, "that if any person shall, from motives of lucre, take away or detain any woman against her will, with intent to marry or defile her; every such offender, and every person counselling, aiding, or abetting such offender, shall be guilty of felony." The 21st section enacts, "that if any person shall maliciously, either by force or fraud, lead or take away, or decoy or entice away, or detain any child under the age of ten years, with intent, c., or if any person shall, with intent, c., receive or harbour any child, knowing the same to have been, by force or fraud, led, taken, decoyed, enticed away or detained, as before-mentioned; every such offender, and every person aiding, counselling, or abetting such offender, shall be guilty of felony." Those acts plainly embrace procurers and receivers, or those who do acts, subsequent to the commission of the offence by the original perpetrator, in aid *Page 419 
of him, or in further prosecution of his or a common design. If we could find any such language in our statute, now under consideration, we should not hesitate to enforce it upon the prisoner, for we have no doubt that his acts are within the mischief which the legislature meant to remedy; but we cannot find in the act itself a warrant for holding the prisoner, or Robins, or Williams, to be more than accessories to the felony of seduction committed by Haney. The judgment was therefore erroneous, and must be reversed; and a venire de novo awarded to the prisoner, Hardin.
DANIEL, Judge, concurred with the Chief Justice.